**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

vs.                                  Case No. 8:02-CR-508-T-17-MSS


ANDRE T. PAIGE

_____/

**ORDER**

        This cause comes before the Court on the defendant's motion to suppress and amended

motion to suppress (Docket Nos. 184 and 185) response thereto (Docket No. S-199).  The Court

held an evidentiary hearing on these motions on June 21 and 23, 2005, and, thereafter, the parties

filed supplemental memoranda in support of and in opposition to the motions to suppress

(Docket Nos. S-230 and 233) .  The defendant seeks to suppress the following: 1) statements

made to law enforcement officers on March 26, 2002, March 29, 2002, and December 19, 2002;

2) grand jury testimony given on February 20, 2003; and 3) trial testimony given on May 7,

2003.  The following facts are taken from the testimony and exhibits presented at the June 2005

evidentiary hearing.


**MARCH 26, 2002**


        Detective Louis Giampavolo, a detective for the Polk County Sheriff's Office, testified

about the March 26, 2002, proceedings.  Detective Giampavolo was assigned to the investigation

of the homicide of Christopher Todd Horner, a Haines City law enforcement officer, which took

place March 3, 1998 (Docket No. 210, pages 33, 39, and 70).  Some people concluded that

Officer Horner committed suicide, but Detective Giampavolo concluded that Officer Horner was

murdered (Docket No. 210, page 72).

CASE NO. 8:02-CR-508-T-17-MSS

In connection with that investigation, Detective Giampavolo, with Special Agent Martha Myers of the Florida Department of Law Enforcement (DEA),[1] went to defendant's girlfriend's house, at about 10:30 a.m., to talk to the defendant (Docket No. 210, pages 34 and 45). The defendant asserted in his testimony that there was a third police officer at his girlfriend's house, at the back door, on that day, but that was not verified by any other testimony (Docket No. 214, page 22). The defendant was not read the *Miranda* rights on this date and the officers, Giampavolo and Myers, did not believe that they were required (Docket No. 210, pages 78 and 80 and Docket No. 211, page 62).

According to Detective Giampavolo and Special Agent Myers, the defendant agreed to talk to the officers about the homicide, and, after being told he was not under arrest or in custody, the defendant agreed to go with the officers to the Sheriff's homicide office, a separate building from the main Sheriff's office (hereafter "office") in the unmarked car in which the officers arrived, since he had no car nor did he have a driver's license.  The defendant, at the June hearing, testified that: 1) at this time he spoke first to Detective Giampavolo; 2) that the detective never told him that he had a choice whether to go to the office; 3) that he, the defendant, believed he had no choice; and 4) he would not have gone he had known he did not have to go with the officers (Docket No. 214, pages 20, 21, and 23).

Detective Giampavolo stated that if the defendant had had a vehicle and/or a license he could have driven himself to the Sheriff's office (Docket No. 210, pages 34-37 and Docket No. 211, page 50).  While in the vehicle, the law enforcement officers assert that the defendant stated he wanted to take a polygraph test to prove he was not involved in the homicide, but no polygraph test was administered (Docket No. 210, page 36 and Docket No. 211, page 51).  On the other hand, the defendant claims that in the car the officers asked questions and played two statements from Christopher Gamble, who was allegedly involved with the defendant in the

---

[1]The officers were both dressed in casual attire, not in uniforms, and arrived in an unmarked vehicle (Docket No. 210, page 34 and Docket No. 211, page 49).

CASE NO. 8:02-CR-508-T-17-MSS

crimes involved (Docket No. 214, page 24). The officers and Mr. Paige arrived at the office at about 11:30 a.m (Docket No. 210, page 45).

At the office there were no marked vehicles and the detective did not remember seeing any uniformed officers (Docket No. 210, page 37).   The officers testified that the defendant was taken directly to an unlocked, in fact an unlockable, interview room.  The defendant, however, claimed to have been put in a small cell with the door closed and locked for ten or fifteen minutes.   The defendant admitted to being in the interview room after being in the locked cell with Detective Giampavolo, Special Agent Myers[2], and Captain W.J. Martin of the Sheriff's Office (Docket No. 210, pages 36 and 38, Docket No. 211, page 68 and Docket No. 214, page 29). Captain Martin, who was at the office when the defendant arrived with Detective Giampavolo and Special Agent Myers, testified that he saw nothing to suggest that the defendant was under arrest (Docket No. 211, page 68).  The defendant testified that he was told by Detective Giampavolo that "the only thing I had to do was cooperate with him, and I would haven't [sic] to worry about anything" (Docket No. 214, pages 26, 27, and 28).  The defendant asserted that he took this to mean that if he cooperated he would not be arrested (Docket No. 214, page 28).

The defendant was informed that Christopher Gamble had confessed to Detective Giampavolo that he and Andre Paige were involved in several armed robberies and in the murder of Officer Horner.  At the June 2005 hearing, the defendant insisted that he had felt pressured that if he did not answer questions he would be arrested and that he was never told he could leave if he wanted to leave (Docket No. 214, page 30).  During the questioning, the defendant denied any involvement in the crimes which were being discussed but did state that he had previously been picked up, questioned, and released on the homicide (Docket No. 210, pages 39 and 78).  At this time, Mr. Gamble was already in prison for other state charges.  It is unclear how Mr. Gamble came to talk to the Polk County officers, but they did speak to him on March 3, 1998 (Docket No. 210, pages 72 and 73).  The government asserts that Mr. Gamble admitted

---

[2] Special Agent Myers did not remain for the entire interview.   (Docket No. 210, page 38)

CASE NO. 8:02-CR-508-T-17-MSS

involvement in the robbery of the Holiday Inn and the homicide and implicated Mr. Paige (Docket No. 210, pages 74-76).

At the June hearing, Detective Giampavolo testified, as confirmed by Captain Martin, that at the request of the defendant he went to the jail to get Mr. Gamble and bring him back to the office, but the defendant denied having asked to have Mr. Gamble brought in to the office (Docket No. 210, page 39, Docket No. 211, page 18, and Docket No. 214, pages 31 and 32). Bringing Mr. Gamble took about two hours to accomplish, leaving the defendant either with Captain Martin in the room or alone in the room until Mr. Gamble got there at about 3:00 p.m. (Docket No. 210, pages 40 and 46 and Docket 211, pages 18, 19, and 70). Captain Martin said the defendant left the room a couple of times and was not told he had to stay in the unlocked interview room (Docket No. 211, page 71). At the time Detective Giampavolo left to get Mr. Gamble, the officers had been talking to the defendant for approximately ninety minutes (Docket 211, page 19). Detective Giampavolo stated that, upon being brought from the jail, Mr. Gamble told the defendant that he should "give it up" because he, Mr. Gamble, had told the detective about the homicide and the robberies. The defendant also testified that Mr. Gamble told him that the detective brought him to the office to try to get the defendant to cooperate, but he, the defendant, did not want to cooperate, and, further, that Mr. Gamble wanted the defendant's help to get his own sentence reduced (Docket No. 214, pages 35 and 36).

Detective Giampavolo testified that he took Mr. Gamble out of the interview room and when he returned he was informed by Captain Martin that the defendant had "admitted that he was present during the Holiday Inn robbery" (Docket No. 210, pages 41 and 47). Captain Martin testified that, just before Mr. Gamble was removed by Detective Giampavolo, the defendant started to cry, and, that after Gamble left, the defendant acknowledged that he was involved in the Holiday Inn robbery because he was forced to participate by Gamble and Bouyie (Docket No. 211, page 72). At the hearing, the defendant denied making any confession on that day (Docket No. 115, page 174). However, after waiver of the privilege, his attorney testified that in their initial meeting the defendant told her he had confessed to a robbery to Detective Giampavolo (Docket No. 115, page 209).

4

CASE NO. 8:02-CR-508-T-17-MSS

      Detective Giampavolo stated that he then talked to the defendant who said he took part in the robbery, as the driver and at gunpoint, with Christopher Gamble and Jeffrey Bouyie, but he couldn't explain why he didn't drive away after Gamble and Bouyie went in to rob the Holiday Inn if he had been under duress until that point.  The defendant had no explanation for not leaving and stated he was given $800.00 for his participation. At the hearing, the defendant continued to deny any involvement in the homicide (Docket No. 210, page 42).  The defendant's version is that he was being badgered by Detective Giampavolo to confess to the robberies and involvement in the murder, but, that he, the defendant, kept denying any involvement (Docket No. 214, page 38).

      Detective Giampavolo testified that no promises were made to the defendant during the interview, further, he denied that any threats were made (Docket No. 210, page 42).  Special Agent Myers also testified that at no time in her presence were there any promises or threats to the defendant (Docket No. 211, pages 53 and 54).  According to the testifying officers, the defendant was not arrested, was not put in handcuffs, was allowed to go to the bathroom unaccompanied (the defendant denied this and claimed to have been escorted by Detective Giampavolo), was offered food[3] and beverages, was told he could leave at any point, was outside at least twice during the day, and,  after the interview concluded, the defendant was returned to within a block of his girlfriend's house, where the defendant requested to get out of the car (Docket No. 210, pages 43 and 44, Docket No. 211, page 69 and Docket No. 214, page 39). Detective Giampavolo testified that, during this interview at the office, Mr. Paige never made a request to go home or to leave (Docket No. 211, page 20).  The defendant was dropped off by Special Agent Myers' unmarked car at about 6:00 p.m., after the interview concluded at about 5:00 p.m. (Docket No. 210, page 47 and Docket No. 211, page 53).

**MARCH 29, 2002**

---

[3] The detective stated that defendant refused food but Mr. Gamble did eat during the time he was at the office (Docket No. 211, page 20).

CASE NO. 8:02-CR-508-T-17-MSS

Detective Giampavolo interviewed the defendant again on March 29, 2002, but had no further conversations with the defendant between March 29, 2002, and the date of his arrest, December 19, 2002 (Docket No. 210, page 81).   The defendant testified that on March 29, 2002, the detective asked him the same questions he had  asked on March 26th (Docket No.114, page 45).  The government does not intend to introduce any statements made by the defendant on this date at trial.  Therefore, the motion to suppress on the statements made on March 29, 2002, will be denied as moot.

**<u>DECEMBER 19, 2002</u>**

On or about December 19, 2002, the defendant was indicted under the Hobbs Act for armed robbery and carrying a firearm in relation to that Hobbs Act robbery.  The defendant was arrested that same day on an outstanding warrant for driving with a suspended or revoked driver's license (Docket No. 210, pages 48 and 49).  The defendant testified that, on December 17, 2002, he had returned from living in Alabama with his sister because his mother had called to tell him that law enforcement was looking for him on an outstanding misdemeanor warrant (Docket No.114, page 50).

Detective Giampavolo testified that after the defendant's arrest, by another officer, he informed the defendant that he has been indicted in relation to the Holiday Inn armed robbery and his *Miranda* warnings were read to the defendant while still at his mother's house (Docket No. 210, page 49). Again the defendant's version is different; he testified that Detective Giampavolo arrested him on the misdemeanor warrant, that he was not given his *Miranda* rights and denied being told, at this point, about the Federal indictment (Docket No. 214, pages 53 and 54).

The defendant was taken in a marked car, with a uniformed officer driving, to the office (Docket No. 210, page 51). Detective Giampavolo questioned the defendant at the office and he was again advised that he had been indicted for the March 3, 1998, Holiday Inn robbery and gun

CASE NO. 8:02-CR-508-T-17-MSS

charge, the robbery that had occurred the same morning as the Horner homicide (Docket No. 210, pages 51 and 52). Julio Lima, Polk County Sheriff Deputy assigned to the DEA task force in Tampa, also attended that interview (Docket No. 211, page 87). Detective Giampavolo summarized the interview as follows:

> [W]hen he was brought to our office, Mr. Paige said that he didn't believe that he was indicted over here in Tampa by the federal government. He thought I was bluffing him and making this up.

> I also explained to Mr. Paige that there was a Shoney's robbery that occurred several--or a couple of weeks after the Holiday Inn robbery also in March of '98, that there was a stolen Caprice used in that robbery, that Christopher Gamble told us that he and Andre Paige and Jeffrey Bouyie did that robbery as well.

> I told Mr. Paige that his fingerprints were found on that stolen vehicle. Again Mr. Paige said I was bluffing him. I was lying to him. I showed him the actual identification report where his prints were matched to the latents lifted off that vehicle. Again, he didn't believe me. He did ask the question, why did it take--at that time it was 2002--why did it take four years to identify his fingerprints on that vehicle, which is a pretty good question, because nobody ever bother to compare it...

> I don't believe he admitted to being involved in the Holiday Inn robbery that day (Docket No. 210, pages 52 and 53).

The defendant was then transported to the Polk County jail on the warrant for the driver's license violations, but later was turned over to the Federal authorities on a writ (Docket No. 210, pages 53 and 54).   The defendant stated that he also talked to Assistant United States Attorney James Muench on the telephone during this period and that Mr. Muench said it would be in the defendant's best interest to cooperate, but, he, the defendant, refused to talk to Mr. Muench or give him any information (Docket No. 114, pages 58 and 91).  The defendant further claimed that he wasn't told about the Federal indictment until after talking to Mr. Muench on the telephone and that he, the defendant, did not believe he had been indicted (Docket No. 114, page 61).

An initial appearance was held on January 9, 2003, before United States Magistrate Judge Mary Scriven.  The magistrate judge informed the defendant that he had the right to

CASE NO. 8:02-CR-508-T-17-MSS

remain silent but that if he chose to talk about the case he should assume that the conversations would be used against him, and he was advised of the penalties he was facing for the counts set forth in the indictment (Docket No. 210, pages 56-57 and Docket No. 211, page 88 ).  At this time, Deputy Lima indicated to the defendant's retained attorney, Karen Meeks, that law enforcement would like to talk to Mr. Paige (Docket No. 211, page 89). The first contact Detective Giampavolo had with Ms. Meeks on this case was at this first initial appearance in front of the magistrate judge (Docket No. 210, page 87).

A superceding indictment was returned against the defendant on January 23, 2003, which included two additional counts of robbery, two additional counts of using or carrying a firearm during the robberies, and one count of conspiracy to commit Hobbs Act robberies (Docket No. 210, page 54).  Another arraignment was held by Magistrate Judge Scriven on February 6, 2003, as to the superceding indictment.  The magistrate judge again explained all of the defendant's rights (Docket No. 210, pages 57 and 59 and Docket No. 211, pages 90 and 91).  The defendant was represented at this arraignment by Karen Meeks, his retained attorney (Docket No. 210, page 59).   At both arraignments, the magistrate judge explained all the defendant's right and also explained, in detail, all of the maximum penalties, and ramifications of being found guilty of, all of the seven felony charges that the defendant faced, including a total sentence of consecutive sixty years for the firearm charges (Docket No. 211, page 193). The defendant asserts that he did not pay attention to what the magistrate judge told him at these hearings.

At some point in time after February 6, 2003, the defendant's attorney, Karen Meeks, indicated that the defendant was willing to talk to law enforcement about the Holiday Inn robbery (Docket No. 210, page 55 and Docket No. 211, page 91).  Detective Giampavolo and Detective Julio Lima, a DEA task force agent, met with Ms. Meeks and the defendant (Docket No. 210, pages 59 through 61). Detective Giampavolo testified that during this interview the defendant admitted his involvement in the Holiday Inn robbery and the first Shoney's robbery and, further, the detective testified that no promises or threats were made to or against the defendant at that meeting (Docket No. 211, page 92).  However, the detective stated that the

CASE NO. 8:02-CR-508-T-17-MSS

defendant did agree to testify before the grand jury in the government's effort to indict Jeffrey Bouyie (Docket No. 210, page 61).

## FEBRUARY 20, 2003 AND MAY 7, 2003

The defendant, on February 20, 2003, was brought in front of the grand jury, where he confirmed that he was appearing voluntarily and with his attorney's consent (Docket No. 210, page 63). No *Miranda* warnings were given to the defendant during his grand jury testimony (Docket No. 210, page 94). Ms. Meeks did not appear with the defendant at the grand jury. Mr. Bouyie was indicted on February 20, 2003. Thereafter, the defendant was prepared for his testimony in Mr. Bouyie's trial in meetings with Detectives Giampavolo and Lima and Ms. Meeks (Docket No. 210, page 65). Mr. Paige and Mr. Gamble testified at Mr. Bouyie's trial, Mr. Paige on May 7, 2003. However, Mr. Bouyie was acquitted (Docket No. 210, page 99).

Detective Giampavolo testified that from the time of the defendant's first appearance in Federal court, he had never spoken to the defendant without the knowledge and consent of his counsel and there were never any threats or promises against or to the defendant for his testimony before the grand jury and/or in Mr. Bouyie's trial (Docket No. 210, page 66 and Docket No. 211, page 203). The defendant's counsel was always present at any meetings between the defendant and law enforcement (Docket No. 211, page 94).

The government, law enforcement, and the defendant's attorney all testified that the defendant was always instructed that he was expected only to tell the truth (Docket No. 210, page 67, Docket No. 211, pages 96 and 206, and Docket No. 215, page 203). The defendant testified at both the grand jury and the trial without a proffer letter and/or a plea agreement, which the defendant acknowledged during his trial testimony (Docket No. 210, pages 94 and 95 and Docket No. 211, pages 93 and 96).

## THE DEFENDANT

CASE NO. 8:02-CR-508-T-17-MSS

The defendant is twenty-five years old with an eighth grade education (Docket No. 214, page 15). He testified that he gets SSI payments for "mental disabilities" and he had been getting such payments "all his life" (Docket No. 214, pages 15 and 16).  At some point in time after the Federal indictment, Detective Giampavolo became aware that the defendant received SSI payments and that they were for a disability (Docket No. 211, pages 21 and 22). Ms. Meeks stated that she was aware that the defendant was either "ADD" or "ADHD" and had some learning difficulties, but it was only near the end of her representation that he said anything to her about not being able to understand what was going on in his case (Docket No. 211, pages 211 and 212).

The Court notes that in his testimony at the evidentiary hearing, the defendant denied knowing any of his rights or any of the implications of his testifying before the grand jury or at Jeffrey Bouyie's trial.  He denied remembering Magistrate Judge Scriven going over his constitutional rights at the arraignments (Docket No. 114, page 94).  He was consistent in asserting that he had been misused by the government, law enforcement, and his attorney;  in asserting his inability to understand anything that was happening to him;  in asserting that he would never have done anything he did if he had been aware of his rights; and in claiming that he only did what he was told and he had no idea if his testimony was or was not the truth.   The defendant also denied that Ms. Meeks ever explained any proposed plea agreement to him, even though he asked her to, but stated that he tried to read it but he didn't understand it (Docket No. 114, page 80).  Further, he claimed that he was told that he would be a free man if he testified before the grand jury and at the Bouyie trial (Docket No. 114, pages 130 and 132).

The Court notes that, at the evidentiary hearing, when the defendant was answering questions for his attorney he was relatively articulate, knowledgeable, and professed to have a rather accurate memory for the facts and the situations surrounding the events in question. However, when being questioned by the Assistant U.S. Attorney, he became inarticulate, unable to remember any answers, argumentative,  and without the ability to understand the questions.

**MS. MEEKS REPRESENTATION**

CASE NO. 8:02-CR-508-T-17-MSS

A few days after the day of his arrest, the defendant's sister, Annette Wilborn, arranged to retain Karen Meeks to represent the defendant, and they entered into a written agreement (Docket No. 211, pages 26, 27, and 41).  Ms. Meeks was admitted to practice law in the State of Florida in 1987 and is a member of the Middle District Court bar (Docket No. 211, pages 121 and 122).  Ms. Meeks testified that initially she was not aware of the federal charges against the defendant  but that she quoted a fee of $10,000.00 for the case involving robbery charges, to which she believed there was an admission of involvement by the defendant (Docket No. 211, page 124).  Ms. Wilborn testified that entire retainer was to be $15,000.00, however, at the time of the hearing Ms. Wilborn had made payments to Ms. Meeks totaling approximately $2,000.00 (Docket No. 211, pages 28 and 42).  Ms. Meeks thought that she had been paid approximately $3,500.00 by the defendant's sister (Docket No. 211, page 127).

Ms. Meeks first met the defendant sometime around Christmas of 2002 (Docket No. 211, page 126).  The defendant did not object to Ms. Meeks representing him to Ms. Wilborn (Docket No. 211, page 31).  Ms.  Meeks entered an appearance in regard to the Federal indictment  about January 2003 (Docket No. 211, page 129).  Prior to representing the defendant, Ms. Meeks had represented defendants in four federal cases.  Some were drug cases.  Only one proceeded to trial (Docket No. 211, pages 130 and 135 and Defendant's Exhibit 8).  Ms. Meeks had defended homicide cases in her career (Docket No. 211, page 143).  She was aware of plea agreements and had clients who entered into plea agreements with the U.S. Attorney's Office (Docket No. 211, page 147).  Ms.  Meeks stated that where there is a plea agreement, typically, the government will promise to request a 5K.1 or Rule 35 motion for the defendant if they find  appropriate cooperation was rendered (Docket No. 211, page 105).  Law enforcement was aware that implication in the robberies might be used in a felony murder charge (Docket No. 211, page 106 and 107).

Ms. Meeks became aware that her client was a suspect in the murder of Officer Horner early in her representation (Docket No. 211, page 137).  The defendant denied ever being told that he might be charged in the homicide of Officer Horner (Docket No. 114, page 70).  The government did provide Ms. Meeks with proposed plea agreements for Mr. Paige.  The plea

CASE NO. 8:02-CR-508-T-17-MSS

agreements did not contain any protection stating that any statements made in connection to the robberies would not be used against the defendant in regard to the homicide investigation (Docket No. 211, page 147).  Ms. Meeks was aware that if Mr. Paige pled guilty of the Hobbs Act robberies, under the Federal sentencing guidelines at that time, he could have been held accountable for the homicide under the relevant conduct guideline, and, further, that if he were found guilty of the same robberies, he could also be held accountable for the murder (Docket No. 211, pages 149 and 150).  Additionally, Ms. Meeks stated that Mr. Paige was also aware of these facts (Docket No. 211, page 150).

Deputy Lima told Ms. Meeks from the time of the defendant's indictment that law enforcement thought her client was involved in the murder of Officer Horner.  In fact, he told Ms. Meeks that within hearing distance of the defendant on at least one occasion (Docket No. 211, pages 108 and 115).  Ms. Meeks advised her client to cooperate and she testified that he indicated that he wanted to cooperate from the first meeting, before any discovery was provided by the government (Docket No. 211, pages 150 and 151).  The defendant agreed to meet with the Assistant U.S. Attorney and Ms. Meeks thought it was in his best interest; she did not seek a proffer letter (Docket No. 211, page 152). Ms. Meeks testified that at the beginning of her representation she explained all his rights to Mr. Paige, but he always insisted that he needed a deal, that he did not want to go to trial, and that he wanted to cooperate; therefore, she did not continue to restate his rights, including the right not to testify (Docket No. 211, page 182).  Ms. Meeks also advised the defendant not to make telephone calls from the jail because they would be taped, but he continued to make calls and to make statements during those calls (Docket No. 211, page 198). Ms. Meeks stated that she is confident that the defendant knew he had the right not to testify (Docket No. 211, page 199).  The defendant testified at the evidentiary hearing that he never wanted to co-operate but that Mr. Muench, Detective Giampavolo, Detective Lima, and his lawyer told him that he had to cooperate, or that it was in his best interest to cooperate (Docket No. 114, pages 68 and 69).

After receipt of discovery, Ms. Meeks did not file any motions to suppress in this case (Docket No. 211, page 151).  She was aware from the discovery that there was no physical

CASE NO. 8:02-CR-508-T-17-MSS

evidence connecting her client to the murder of Officer Horner (Docket No. 211, page 162).

The only link between her client and the murder, known to the government, was Christopher

Gamble, who Ms. Meeks knew was a convicted felon who was at that time in jail and trying to

get his sentence reduced (Docket No. 211, pages 163 and 164).  There was physical evidence

against Mr. Paige as to the robberies: hand prints, and the defendant's pre-existing confession

(Docket No. 211, page 199). Mr. Paige claims that the hand prints were planted by law

enforcement (Docket No. 215, page 179).

        In conference with the government (which included Mr. Muench, Detective Giampavolo,

and Detective Lima), there were no overt promises made but Ms. Meeks stated she concluded

that Mr. Paige was being viewed in a light apart from the other suspects in the murder.  Some of

the reasons for the difference were that he had a lesser record and lesser involvement in the

murder, so she thought that, with his cooperation, he might, be treated differently (Docket No.

211, page 154).  The statements which led to Ms. Meeks belief were made by the Assistant U.S.

Attorney, James Muench (Docket No. 211, page 155).  Ms. Meeks believed, and related the same

to her client, that Mr. Muench was "honest" (Docket No. 211, page 159).   Ms. Meeks also

believed, to the best of her present recollection, that there was a statute of limitations issue that

required the government to move quickly to supercede Mr. Paige's indictment and to indict any

other persons on the charges on which the statute of limitations were to run (Docket No. 211,

pages 160 and 196).

        At some point in time, Ms. Meeks became aware that the government wanted Mr. Paige

to assist in the prosecution of Mr. Bouyie (Docket No. 211, page 165). Mr. Paige testified in

front of the grand jury, but Ms. Meeks was not there and she had notified her client that she

could not be in attendance (Docket No. 211, pages 168 and 169).  Ms. Meeks testified that she

knew that the defendant would be implicating himself in a robbery and she believed that it would

be "cooperation" and it would be ultimately of some benefit to Mr. Paige (Docket No. 211, page

168.  At this time, Ms. Meeks had no agreement, written or unwritten, with the government, but

she had discussed the right to remain silent with her client and had told him that admissions as to

CASE NO. 8:02-CR-508-T-17-MSS

the robberies could be used against him in a homicide prosecution (Docket No. 211, pages 169 and 170).

Mr. Paige again testified at Mr. Bouyie's trial on May 7, 2003.  Ms. Meeks was not present in the courtroom at that time.  She had spoken with the defendant a few days prior to his testimony (Docket No. 211, pages 168, 171 and 172).   The decision, on Ms. Meeks' part, to allow the defendant to testify was based on information received from her client and his decision to cooperate; indeed, the defendant's need and desire to cooperate (Docket No. 211, pages 172 , 173, and 174).

At some point after his testimony at Mr. Bouyie's trial, Ms. Meeks discussed  a proposed plea agreement with the defendant and may or may not have recommended that he sign it[4] (Docket No. 211, pages 175, 176, and 214).  Mr. Paige's trial was scheduled for September 15, 2003, when Mr. Paige indicated that he was dissatisfied with Ms. Meeks' representation (Docket No. 211, pages 177 and 178).   It is Ms. Meeks' position that her client agreed to waive his speedy trial rights and that Mr. Paige always indicated to her that he did not wish to go to trial (Docket No. 211, page 179).   Mr. Paige denied having allowed Ms. Meeks to waive his speedy trial rights (Docket No. 114, page 77).    Ms. Meeks was allowed to withdraw as counsel for Mr. Paige and the Court appointed new counsel (Docket No. 211, page 180).   Ms. Meeks has never had another client that testified without an agreement when their testimony would implicate the client in a criminal act (Docket No. 211, page 184).

## DISCUSSION

## MARCH 26, 2002 EVENTS

---

[4] Ms. Meeks testified first that she did recommend he take the plea agreement (Docket No. 211, page 175) but later testified that she did not recommend him to sign the agreement (Docket No. 211, page 214).

CASE NO. 8:02-CR-508-T-17-MSS

        The parties are in essential agreement as to the standard for determining whether or not
the statements made on March 26, 2002, should be suppressed.  As set forth in **Miranda v
Arizona**, 384 U.S. 444 (1966), the Fifth Amendment privilege against compulsory self-
incrimination applies in the context of custodial interrogation.  The *Miranda* court held that, "the
prosecution may not use statements, whether exculpatory or inculpatory, stemming from
custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards
effective to secure the privilege against self-incrimination. By custodial interrogation, we mean
questioning initiated by law enforcement officers after a person has been taken into custody or
otherwise deprived of his freedom of action in any significant way." Miranda at 1612.  The
United States Supreme Court has further held that by "custodial interrogation, we mean
questioning initiated by law enforcement officers after a person has been taken into custody or
otherwise deprived of his freedom of action in any significant way...[here] there is no indication
that the questioning took place in a context where respondent's freedom to depart was restricted
in any way...[and the defendant] came voluntarily to the police station, where he was
immediately informed that he was not under arrest...It is clear from these facts that Mathiason
was not in custody 'or otherwise deprived of his freedom of action in any significant way.'"
**Oregon v Mathiason**, 429 U.S. 492, 494 (1977).  Under the narrower standard appropriate in
the *Miranda* context,  the defendant in **California v. Beheler**, 463 U.S. 1121 (1983)  was not "in
custody" for purposes of receiving *Miranda* protection since there was no formal arrest or
restraint on freedom of movement of the degree associated with a formal arrest.  Beheler at 1123.
See also, **Minnesota v Murphy**, 465 U.S. 420, 431 (1984).

        The custodial question is to be decided on an objective reasonable man standard, how a
reasonable man in the defendant's position would perceive his circumstances, not on the
subjective views of either the interrogator or the person being questioned.  **Berkemer v.
McCarty**, 468 U.S. 420 (1984); **Stansbury v. California**, 511 U.S. 318 (1994); and
**Yarborough v. Alvarado**, 541 U.S. 652 (2004).  Under this standard the "reasonable person
from whose perspective 'custody' is defined is a reasonable innocent person." See **Florida v.
Bostick,** 501 U.S. 429, 437-38, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). Whether a

CASE NO. 8:02-CR-508-T-17-MSS

defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.  **United States v Moya**, 74 F.3d 1117, 1119 (11th Cir. 1996).

The Court has considered the testimony and other evidence presented at the suppression hearing, and concludes that the interview of Andre Paige on March 26, 2002, was non-custodial and, therefore, no *Miranda* warnings were required and the statements made will not be suppressed.  The Court specifically finds the testimony of Detective Giampavolo, Special Agent Myers, and Captain Martin to be more credible on this issue than that of the defendant Andre Paige.  The defendant has an understandable impetus to testify in a manner that he hopes will result in suppression of the evidence in question.  Further, the Court finds that, under the facts of this case as recited by Detective Giampavolo, Special Agent Myers, and Captain Martin, a "reasonable innocent person" in the same circumstances would not have concluded that the questioning on March 26, 2002, was custodial in nature and would not have felt deprived of his/her freedom of action in "any significant way." Miranda at 1612.

**POST-ARREST STATEMENTS**

Under this section, the defendant initially seeks suppression of his statements made after his arrest on December 19, 2002, asserting that the Court should determine that Mr. Paige did not voluntarily make the statements at issue.  The Court specifically finds that Detective Giampavolo appropriately advised the defendant of his *Miranda* rights at the time of his arrest.  The Court finds no basis for suppression of the statements made by the defendant on December 19, 2002.

The remainder of the motion to suppress goes to the testimony of the defendant before the grand jury and at the trial of Jeffrey Bouyie. Mr. Paige had retained counsel throughout the time that he testified in these situations.  The first issue is whether or not it was required that the defendant be read his *Miranda* rights prior to either testimony.  The defendant has failed to provide any case law that establishes the requirement for *Miranda* warnings to be given to a grand jury witness or a trial witness.  The government has cited several cases establishing that

16

CASE NO. 8:02-CR-508-T-17-MSS

the United States Supreme Court and several circuit courts have declined to require the same. Therefore, this Court finds no basis for suppression of the defendant's testimony for the failure to give the *Miranda* warnings to the defendant before the grand jury and/or at Mr. Bouyie's trial.

One argument of the defense is that the alleged ineffective assistance of counsel should result in suppression of his grand jury and trial testimony. The defense also argues that this Court should suppress the grand jury and trial testimony because Ms. Meeks' representation of the defendant was so deficient that the prosecutor should have determined that Mr. Paige was effectively not represented.  Further, the defense argues that the prosecutor intentionally took advantage of the defendant and did not fulfill his duty "to ensure that all persons accused of crimes receive due process of law." (citation omitted.).

Having researched the issue, the Court agrees with the government that ineffective assistance of counsel is not a basis for suppressing statements made by the defendant before the grand or the petit juries.  The record in this case establishes that Mr. Paige was informed of his rights by a magistrate judge of this court on at least two occasions[5], he had received his *Miranda* warnings appropriately after his arrest, and he had retained counsel.  There is nothing in this record which leads the Court to find that the government should have second-guessed the defendant and his retained counsel to conclude that Mr. Paige was "unrepresented."

If the Court were to find that suppression is required here, the Court would force the government to have to "'divine a defendant's motivation for speaking or acting as he did even though there is no claim that government conduct coerced his decision.'  If defendant's argument was accepted, [the government] would be put in the untenable situation of having to evaluate a suspect's attorney's performance... If the accused has consulted with an attorney and indicated that he understands the rights he is giving up, no additional inquiry into the quality of the counsel's advice is required." **United States v. You Hong Chen**, 104 F.Supp. 3d 329, 333

---

[5]The fact that the defendant may not have listened to the warnings of the magistrate judge is irrelevant.  He received the warnings and it was his option not to heed them.

17

CASE NO. 8:02-CR-508-T-17-MSS

(S.D.N.Y. 2000).  A court should not subject voluntary statements to suppression merely because an attorney may have given his/her client bad advice.  **Claudio v. Scully**, 791 F. Supp. 985, 988 (E.D.N.Y. 1992).  Accordingly, it is

      **ORDERED** that the motion to suppress and amended motion to suppress (Docket Nos. 184 and 185) be **denied** .

      **DONE and ORDERED** in Chambers in Tampa, Florida, this 1st day of September, 2005.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to: All Counsel of Record